UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10027-PBS |
| | ) | |
| MATTHEW VICKERS | ) | |

DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO SUPPRESS (SEARCH AND SEIZURE)

Defendant, Matthew Vickers, respectfully moves that this
Court suppress from evidence drugs, and any other items allegedly
observed or seized during warrantless searches and seizures of
him on May 14, 2001 and October 19, 2003.  As grounds for this
motion, defendant states that the evidence was obtained in
violation of his rights under the Fourth Amendment to the
Constitution.

**RELEVANT FACTS**

A.  **MAY 14, 2001 SEIZURE**

1.  Government's Version of the Defendant's Seizure

The following facts are derived from a May 15, 2001 Boston
police incident report written by Boston Police Officer Darryn
Brown, the June 12, 2001 Suffolk County Grand Jury testimony of
Officer Vance C. Mills, and Mills' November 4, 2002 testimony at
an evidentiary hearing in Suffolk Superior Court.  The police
report is attached as Addendum A.  The grand jury minutes are
attached as Addendum B.  The relevant portion of the evidentiary
testimony is attached as Addendum C.

Boston Police Officers Vance Mills, Darryn Brown, and Mark Bordley are assigned to the Boston Police Youth Violence Strike Force.  On May 14, 2001 they were together in plain clothes in an unmarked Crown Victoria.  This car has standard police equipment inside but features flashing emergency lights only in the grill.

At about 7:30 p.m. they were traveling in Dorchester on Columbia Road near the Uphams Corner area.  Officer Mills was driving.  While traveling, Officer Brown noticed a white motor vehicle coming from the opposite direction that the team had stopped about a week or more before.  Mills recalled that when he'd stopped the white car the week before, he'd had a conversation with the operator and found that the operator had a live warrant on his record.  The team let the operator go the week before without arresting him, and upon seeing the car on May 14th the officers decided to catch up with the motor vehicle to see if the operator had taken care of the warrant.  Mills made a U-turn and began following the white motor vehicle, but quickly lost sight of it.

Mills took a left onto side streets in an effort to head off the car down a route Mills predicted it might go.  On one of these side streets, Monadnock, Mills found himself behind two cars traveling down the street.  While on Monadnock behind the cars Mills could see the white car go by on Dudley St., the main street to which Monadnock headed.  Mills turned on his lights and

-2-

siren.  The motor vehicle that was directly ahead of Mills pulled over to the right.  A blue Honda Civic in front of that car, however, did not immediately move out of the way but instead continued on at the speed limit to the corner of Monadnock and Dudley Streets.  There, Mills tried to go to the right of the Honda but the Honda pulled to the right in front of him.

Mills apparently abandoned his quest to determine whether the operator of the white car had cleared up the outstanding warrant.  Instead, he became curious why the Honda hadn't pulled over sooner.  He made a left turn onto Dudley St. and followed the blue Honda down Dudley until it made a left turn onto Magnolia St.  The team followed the blue Honda down Magnolia St. to Magnolia Square when the operator fled the car.  The officers gave chase and stopped defendant at a fence about thirty feet away from the car.  Officer Brown recovered a plastic bag with two rocks along the flight path between the car and the fence.

Later, after booking, defendant was overheard making a telephone call by the booking desk.  According to Mills, defendant stated to an unknown recipient that he had been caught with a "62"; in Mills's training and experience, this refers to 62 grams, a common drug weight.

2.  Defendant's Version of the Search and Seizure

The following facts are derived from the Affidavit of Matthew Vickers in Support of Defendant's Motion to Suppress.

-3-

The defendant was driving at a normal rate of speed on Monadnock St. in Dorchester when he saw an unmarked police car.  The police car did not try to get around him but rather continued to follow him.  When the officers continued to follow him, he got out of the car and ran.  The defendant was arrested.

B.    **OCTOBER 19, 2003 SEIZURE**

    1.    <u>Government's Version of the Defendant's Seizure</u>

The following facts are derived from an October 19, 2003 Boston police incident report written by Boston Police Officer James Coyne and the December 2, 2003 Suffolk County Grand Jury testimony of Officers Coyne, Scott Roby, and James Powell.  The police report is attached as Addendum D.  The grand jury minutes are attached as Addendum E.

Officer Coyne was assigned to a single-man marked cruiser on the third shift on October 19, 2003.  At about 3:00 a.m. Coyne had just finished responding to one call and was on his way to another priority call for a robbery that had just occurred on Lawrence Avenue in Roxbury.  To get to Lawrence Avenue, Coyne drove down Geneva St. and turned onto Normandy.  Another marked cruiser, containing Officers Carl Blando and James Powell, was also responding to the Lawrence Avenue call and followed Coyne down Normandy Street.  Both cruisers had their lights on, and Coyne had his siren on.  Coyne noticed a red Honda pull out from Stanwood St., a street that intersects Normandy.  Coyne used his

air horn to alert the driver to get out of the way.  The red
Honda did not immediately pull over to the side, but rather
continued on at the speed limit before pulling over at the Corner
of Creston St.

Coyne, Blando and Powell apparently abandoned their efforts
to respond to the Lawrence Ave. robbery call and decided to
conduct a traffic stop instead.   Coyne pulled his cruiser in
front of the Honda while Blando and Powell pulled in behind it.
Coyne allegedly detected a motion by the driver of the car as he
was walking up to it.  Coyne ordered (and then assisted) the
driver, later identified as the defendant, to get out of the car.
Coyne conducted a pat frisk of the defendant.  Officer Coyne
began to question the defendant.  The defendant gave a correct
date of birth and address but a false name.  While Coyne was
waiting to verify the information given to him, two more
officers, Scott Roby and Brian Griffiths, arrived on the scene.
Officer Roby identified the defendant as Matthew Vickers.  After
processing the defendant's name with the given date of birth and
address, Officer Coyne discovered the defendant's license was
revoked and there were outstanding warrants.  The defendant was
arrested and put into Officer Powell's cruiser.

While other officers conducted an inventory search of the
defendant's car, Officer Powell noticed the defendant trying to
swallow something.  Officer Powell made the defendant spit out

-5-

what turned out to be a bag concerning thirteen smaller bags of drugs.  Powell also purportedly discovered another bag on the floor of the cruiser at the defendant's feet containing twenty smaller bags of drugs.

2.   Defendant's Version of the Seizure and Search

The defendant was driving on Normandy St. in Dorchester when he noticed a police cruiser behind him.  He pulled over at the first available spot to get out of the way.  The cruiser blocked him in, pulled him out of the car, searched him, and arrested him.

**ARGUMENT**

Warrantless searches and seizures are presumptively unreasonable.  Coolidge v. New Hampshire, 403 U.S. 443 (1971) ("searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.  The exceptions are 'jealously and carefully drawn' and there must be 'a showing by those who seek exemption that the exigencies of the situation made the course imperative.'").  The defendant submits that in each of the two events, the initial seizure of the defendant was undertaken without either an arrest or search warrant and the officers lacked probable cause or reasonable grounds to believe that the defendant was committing, had committed, or was about to

-6-

commit a crime, or that evidence of a crime was present on the defendant's person, or that the defendant was armed and dangerous.  Terry v. Ohio, 392 U.S. 1 (1968).  In neither case can the government bear its burden of proving the seizure and search of the defendant was justified by any recognized exception to the warrant requirements of the Fourth Amendment.  Coolidge v. New Hampshire, 403 U.S. 443 (1971).

1.    The Defendant was seized within the meaning of the Fourth Amendment.

To determine whether a particular police-citizen encounter constitutes a seizure implicating the Fourth Amendment, the First Circuit applies a fact-specific inquiry into whether a reasonable person would have felt free to leave and terminate the encounter. See United States v. Cardoza, 129 F.3d 6, 14-15 (1st Cir. 1997)(citing Florida v. Bostick, 501 U.S. 429, 439 (1991)); United States v. Young, 105 F.3d 1, 5-6 (1997).  The analysis "considers the totality of the circumstances particular to each encounter." United States v. Cardoza, 129 F.3d at 15.  In United States v. Mendenhall, 446 U.S. 544 (1980), Justice Stewart wrote that examples of circumstances that might indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or a tone of voice indicating that compliance with the officer's request might be compelled."  446 U.S. at 554 (opinion of Stewart, J.).

-7-

In each of the two seizures, the circumstances surrounding defendant's encounter with officers demonstrate that defendant was seized within the meaning of the Fourth Amendment prior to the any observation of contraband.  According to the government's version of the May 14, 2001 seizure, Mills abandoned his pursuit of the white car with the express purpose of satisfying his curiosity as to why the blue Honda did not pull over sooner.  He did this with lights flashing and sirens blaring.  In the October 19, 2003, the government's version makes explicit that even after defendant pulled to the side of the road to let them pass the two cruisers blocked defendant's car thus eliminating any possibility that he could leave of his own accord.

In both cases the defendant was seized within the meaning of the Fourth Amendment prior to the observation of any contraband in plain view.  Neither stop was a police-citizen encounter where the officers merely rolled down their window and asked defendant for a moment of his time.  <u>Compare</u> <u>United States v. Cardoza</u>, 129 F.3d 6, 14-15 (1st Cir. 1997)(no seizure where officers in unmarked car pulled over to curb; rolled down window and asked the defendant "what's up?"; and defendant turned and approached patrol car); <u>United States v. Young</u>, 105 F.3d 1, 5-6 (1997)(no seizure where officers pulled cruiser to curb alongside the defendant; rolled window down and asked defendant if he had a minute to speak with them; and defendant said "sure").  Rather,

this was a circumstance where sirens and lights, the threatening presence of several officers, some physical touching of the person of the citizen, and the use of language or a tone of voice indicating that compliance with the officer's request was compelled.  Mendenhall, 446 U.S. at 554.

Under the defendant's version of the encounters with the Boston police, defendant's seizure before any police observation of contraband is patent.  According to the defendant, officers immediately tried to pull him over on May 14, 2001 without any justification and continued to chase him when he exited his car. Only then did the officers allegedly locate contraband. Similarly, on October 19, 2003, the officers blocked him in rendering submission to their authority compulsory.  Certainly in either of these circumstances the defendant could not have felt free to terminate his encounter with officers.

2.     The Officers' Stop And Search of the Defendant Violated The Fourth Amendment

In neither case did the officers possess an arrest or search warrant authorizing the detention, arrest or search of the defendant.  Accordingly, the government bears the burden of demonstrating that the warrantless searches were permissible under a recognized exception to the warrant and probable cause requirements of the Fourth Amendment.  The government cannot make this showing.

The warrant and probable cause requirements are not excused

-9-

under Terry v. Ohio.  A warrantless search is permissible under
the Terry standard only where a law enforcement officer "observes
unusual conduct which leads him reasonably to conclude in light
of his experience that criminal activity may be afoot."  392 U.S.
1 at 30 (1968).  If that condition is met, the officer is
permitted to do no more than "briefly stop the suspicious person
and make reasonable inquiries aimed at confirming or denying his
suspicions."  Id.  The officer making the stop "must be able to
articulate something more than an inchoate and unparticularized
suspicion or 'hunch'" linking an individual to criminal activity.
United States v. Sokolow, 490 U.S. 1, 7, (1989) (citation and
some internal quotation marks omitted).  This means that some of
the facts on which the officer relies must be particular, that
is, specific to the individual.  See United States v. Cortez, 449
U.S. 411, 418 (1981);  Terry, 392 U.S. at 21 n.18;  United States
v. Proctor, 148 F.3d 39, 42 (1st Cir. 1998).  Consequently, the
proper focus for evaluating the sufficiency of evidence of
reasonable suspicion centers upon the objective significance of
the particular facts under all the circumstances.  See, e.g.,
Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curium).

    Here, in each case, even according to the government's
version of the encounters, officers immediately detained the
defendant knowing only that the car had failed to pull over to
get out of the way as quickly as they desired.  There is nothing

unusual or potentially criminal about that, and certainly nothing implicating the defendant in criminal activity.  The circumstances cited by the officers were simply not enough to turn a hunch into reasonable articulable suspicion.  See United States v. Woodrum, 202 F.3d 1, 13 (1st Cir. 1997) (while facts such as high crime area and the hour of night may put officers on their guard, they cannot, without more, be grounds for detaining).  Consequently, under all of the circumstances, the officers' detention and searches of the defendant were unreasonable and the fruits of those searches must be suppressed.

   3.   No Motor Vehicle Infraction Justifying a Traffic Stop
        Occurred.

   A stop of an automobile by the police constitutes a "seizure" for purposes of the Fourth Amendment.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979).  If the officers had observed a motor vehicle infraction, that fact would justify a stop of the car he was driving.  Id. at 659.  In each case the defendant disputes any assertion that he committed a traffic violation. The anticipated contention that defendant failed to immediately pull over while police were seeking to answer radio calls lacks credibility on its face.  The lawfulness of the stop is a disputed issue that requires an evidentiary hearing.

   The Supreme Court's decision in Whren v. United States, 116 S.Ct. 1769 (1996) does not apply to this case, as defendant does not argue that the claimed traffic violation was a pretext.

-11-

Instead, unlike the petitioner in Whren, id. at 1772-73, the
defendant asserts that the traffic violation did not occur.

4.    The Defendant Did Not Consent to Any Searches.

At no time did the defendant consent to the search of his
person or car.  Indeed, he was not given so much as the
opportunity to consent, but was immediately subject to orders of
the police.  Nor did the defendant "consent" to a search of his
person by acquiescing to officer's commands to get out of the
car, or by answering officer's questions demanding
identification.

It is well settled that consent given after an illegal
search and seizure is invalid.  See, e.g., Florida v. Royer, 460
U.S. 491, 501 (1983); United States v. Valdez, 931 F.2d 1448,
1452 (11th Cir. 1991).  In each case, by the time police
encountered the defendant they had already placed severe
restrictions on the defendant's ability to terminate the
encounter, all without probable cause or legal basis.  For these
reasons, the defendant's acquiescence to the officer's commands
cannot be construed as consent.  The officer's subsequent seizure
of the defendant and seizure of drugs from the defendant thus
constitutes a search contrary to the Fourth Amendment.

5.    Conclusion

Searches based on nothing more than a hunch that a crime may
have been committed have long been universally condemned.  See

-12-

<u>United States v. Lefkowitz</u>, 285 U.S. 452 (1932); <u>Kremen v. United</u>
<u>States</u>, 353 U.S. 346 (1957); <u>United States v. Rivera</u>, 867 F.2d
1261 (10th Cir. 1989) (warrantless search invalid where there was
no probable cause for arrest prior to search).  Law enforcement
officials may not conduct, prior to arrest, a "general and
exploratory" search or a "fishing expedition" in an effort to
"strengthen their case before arresting" a suspect.  <u>Ortiz</u>, 331
F. Supp. at 519.  That is precisely what the officers in both
cases did here, and for the same reasons the <u>Ortiz</u> search was
invalid, the warrantless seizures and searches here are invalid
as well.

### CONCLUSION

For the foregoing reasons, the defendant respectfully moves
that this Court suppress from evidence drugs, and any other items
allegedly observed or seized during warrantless searches and
seizures of him on May 14, 2001 and October 19, 2003.


                         MATTHEW VICKERS,
                         By His Attorney,


                          /s/Timothy G. Watkins
                         Timothy Watkins
                          B.B.O. #567992
                         Federal Defender Office
                         408 Atlantic Ave., Third Floor
                         Boston, MA  02210
                         (617) 223-8061


                              -13-